## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **DATA HEALTH PARTNERS, INC.,**<br><br>        **Plaintiff,**<br><br>v.<br><br>**TELADOC HEALTH, INC.,**<br><br>        **Defendant.** | **Court No. 1:23-cv-00160-JCG** |

## OPINION AND ORDER

This matter involves patent infringement claims filed by Data Health Partners, Inc. ("Plaintiff" or "Data Health") against Teladoc Health, Inc. ("Defendant" or "Teladoc Health"), a telemedicine and virtual health care company, alleging infringement of three patents by Defendant's Livongo Blood Glucose Meter and diabetes management platform.  For the reasons discussed below, Teladoc Health's motion to dismiss the claims is denied in part and granted in part.

### I.    Background

Data Health is the exclusive owner by assignment of U.S. Patents Nos. 10,061,812 ("the '812 Patent"), 11,144,554 ("the '554 Patent"), and 11,151,142 ("the '142 Patent") (collectively, "Asserted Patents"), and holds all rights, title, and

interest in them.  Am. Compl. ¶ 13 (D.I. 14).  The '812 Patent is titled "Platform for Optimizing Data Driven Outcomes" and was issued by the U.S. Patent and Trademark Office ("USPTO") on August 28, 2018.  Id. at Ex. A ("'812 Patent") (D.I. 14-1).  The '554 Patent is titled "Platform for Optimizing Goal Progression" and was issued by the USPTO on October 12, 2021.  Id. at Ex. B ("'554 Patent") (D.I. 14-2).  The '142 Patent is titled "Platform for Optimizing Goal Progression" and was issued by the USPTO on October 19, 2021.  Id. at Ex. C ("'142 Patent") (D.I. 14-3).

Grafton Integrated Health Network ("Grafton") is a private, not-for-profit behavioral health organization that provides services to individuals with intellectual, developmental, and behavioral needs from locations in Virginia and Minnesota.  See id. ¶ 15.  James Gaynor, the CEO of Grafton, and his associates at Grafton developed an approach to provide better treatment for their patients in response to the rising costs from the physical interventions employed on patients. See id. ¶¶ 16–17.

In May 2013, Grafton announced its collaboration with AudioEye, Inc., a software company, to design, patent, and develop a mobile behavioral healthcare technology platform based on a data-management approach that tracked individualized goal outcomes, resulting in a software-as-service product called

REBOOT (Reliable Evidence-Based Outcomes Optimization Technologies).  See

id. ¶¶ 19–21.

In 2014, Livongo Health ("Livongo") launched its flagship diabetes

treatment platform after receiving $10 million in Series A funding and continued to

receive more funding over the next several years: $20 million in Series B funding

in 2015, $44.5 million in Series C funding in 2016, and $52.5 million in funding in

2017.  Id. ¶¶ 23–26.  In 2020, Teladoc Health merged with Livongo in a

transaction valued at $18.5 billion.  Id. ¶ 27.

The Amended Complaint[1] alleges that Teladoc Health directly, indirectly,

and willfully infringed one or more claims of each of the Asserted Patents with its

Livongo Blood Glucose Meter and corresponding diabetes management platform,

and seeks declaratory judgment, monetary damages, and attorneys' fees.  See id.

¶¶ 32–34, 38–40, 44–46.

On September 11, 2023, Teladoc Health moved to dismiss the Amended

Complaint.  Def.'s Mot. Dismiss Pl.'s Am. Compl. ("Def.'s Mot. Dismiss") (D.I.

18); Def.'s Opening Br. Supp. Mot. Dismiss Pl.'s First Am. Compl. ("Def.'s

---

[1]  Data Health first filed this action against Teladoc Health for infringement of two
patents, the '812 Patent and the '554 Patent, on February 13, 2023, but later
amended its complaint on June 23, 2023 to include a count for infringement of the
'142 Patent.  See Compl. (D.I. 1); Am. Compl.

Moving Br.") (D.I. 19).  Data Health opposed the motion and Teladoc Health filed

its reply brief.  Data Health's Br. Opposing Teladoc's Mot. Dismiss First Am.

Compl. ("Pl.'s Opp'n Br.") (D.I. 20); Def.'s Reply Br. Supp. Mot. Dismiss

("Def.'s Reply Br.") (D.I. 25).

## II.    Legal Standard

Federal Rule of Civil Procedure 8(a) requires that pleadings contain a short

and plain statement of the claim showing that the pleader is entitled to relief.  Fed.

R. Civ. P. 8(a)(1).  If pleadings fail to state a claim, in whole or in part, on which a

court may grant relief, a defendant may seek to dismiss a complaint under Federal

Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  "To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Id.  Plausibility requires "more than a sheer possibility that a

defendant has acted unlawfully."  Id.  In considering a motion to dismiss, the Court

must assume the factual allegations contained in the complaint to be true and draw

all reasonable inferences in favor of the non-moving party.  Twombly, 550 U.S.

555–56.  However, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to state a claim.  Iqbal,

556 U.S. at 679.

In patent infringement cases, allegations of infringement are governed by the

Iqbal/Twombly pleading standard.  Golden v. Apple Inc., 819 F. App'x 930, 930–

31 (Fed. Cir. 2020).  There must be some factual allegations that, when taken as

true, articulate why it is plausible that the accused product infringes the patent

claim.  Bot M8 LLC v. Sony Corp., 4 F.4th 1342, 1353 (Fed. Cir. 2021).

**III.    Discussion**

**A.    Extrinsic Documents**

In considering a motion to dismiss, a district court may consider any

document integral to or relied upon in a complaint and may take judicial notice of

any public records.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426

(3d Cir. 1997); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d

1192, 1196 (3d Cir. 1993).  Courts have taken judicial notice of prosecution

histories for purposes of a motion to dismiss because such documents are public

records.  Genetic Techs. Ltd. v. Bristol-Myers Squibb Co., 72 F. Supp. 3d 521, 526

(D. Del. 2014), aff'd sub nom. Genetic Techs. Ltd. v. Merial LLC, 818 F.3d 1369

(Fed. Cir. 2016) (citations omitted).

## 1.    Prosecution History

The Court takes judicial notice of the Notice of Allowability as a public

record for purposes of the instant motion to dismiss.  See Decl. Monica Daegele

Supp. Pl.'s Opp'n Mot. Dismiss ("Decl. Daegele") (D.I. 21); id. at Ex. A ("Notice

of Allowability") (D.I. 21-1).  The prosecution history of the '812 Patent is

relevant to Defendant's motion to dismiss.  During prosecution, the examiner

considered claims 1 to 20 of the '812 Patent and deemed them allowable.  The

examiner determined that prosecution amendments further defined the claims

under Alice Corp. Pty. Ltd. v. CLS Bank Int'l ("Alice"), 573 U.S. 208, 216 (2014),

rendering the claims less abstract and having useful improvements to technology;

the amendments recited that the clients are individuals receiving treatment or

assistance, the providers are individuals who treat or assist the clients, and the

providers periodically provide and update the data, which relates to the well-being

of the clients.  Notice of Allowability at 3.  The prosecution history stated:

> Specifically, the claims are deemed to be statutory under 35 [U.S.C. §]
> 101 under Alice, as they recite a way for clients to receive assistance
> from providers in a specific way that requires the continuous adding
> and compiling of data for the clients in order to determine changes in
> the client behavior that may be vital to the well-being of the client.  This
> is therefore rooted in a specific technology, and requires the processing
> of [a] specifically equipped computer in order to perform the
> methodology.  This specifically recites an improvement to the
> technology, in that clients can better receive the treatment that they
> need and providers can better give the treatment the clients need.
> Therefore[,] the Examiner believes that the independent claims, as
> amended, stand in condition for allowance.

Id.

## 2. Teladoc Health's Exhibits

Teladoc Health attached four exhibits to its moving brief. See Def.'s Mot.
Dismiss at Exs. A, B, C, D (D.I. 19-1). Data Health argues that the Court should
not consider Exhibits B, C, and D because the documents demonstrate an
"erroneous analysis" in their categorization of claim elements individually, rather
than as a whole. Pl.'s Opp'n Br. at 17–18. Teladoc Health asserts to the contrary
that these exhibits categorize claim elements both individually and as an ordered
combination and may be considered by the Court to aid in its analysis of the claim
elements. Def.'s Reply Br. at 9. Data Health does not contest the validity of
Exhibit A, which includes a table showing a side-by-side comparison of claim 1 of
each of the Asserted Patents. See Def.'s Mot. Dismiss at Ex. A.

Exhibit B includes a table that shows a side-by-side comparison of the
language of claims 1, 11, and 16 of the '812 Patent, highlighted with different
colors to denote the claim concepts of "conventional computer functions,"
"longstanding pen-and-paper process," and "generic computer equipment." See id.
at Ex. B. Exhibit C includes a table that shows a side-by-side comparison of the
language of claims 1, 13, and 17 of the '554 Patent, highlighted with different
colors to denote the aforementioned claim concepts. See id. at Ex. C. Exhibit D
includes a table that shows a side-by-side comparison of the language of claims 1,

11, and 16 of the '142 Patent, highlighted with colors to denote the aforementioned claim concepts.  See id. at Ex. D.

While Teladoc Health's exhibits are not integral to or relied upon in the Amended Complaint, these documents are provided as Defendant's categorization of the Asserted Patents' claim elements and reflect Defendant's arguments in its moving brief.  See Def.'s Moving Br.  Therefore, the Court has discretion to consider these exhibits to the extent that they are a visual extension of Defendant's arguments concerning the patents at issue.

### B.   Patent-Eligible Subject Matter

Teladoc Health moves to dismiss all claims of infringement with prejudice because the Asserted Patents claim patent-ineligible subject matter under 35 U.S.C. § 101.  Def.'s Moving Br. at 1.

35 U.S.C. § 101 makes patentable "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  This broad provision has an important exception: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." Alice, 573 U.S. at 216 (2014).  The purpose of these exceptions is to protect the "basic tools of scientific and technological work."  Mayo Collaborative Servs. v. Prometheus Labs., Inc. ("Mayo"), 566 U.S. 66, 71 (2012).  Eligibility "is a

question of law" with "underlying questions of fact."  <u>Simio, LLC v. FlexSim Software Prods., Inc.</u>, 983 F.3d 1353, 1358–59 (Fed. Cir. 2020).

In <u>Alice</u>, the U.S. Supreme Court reaffirmed the two-step framework set forth in <u>Mayo</u> for distinguishing patents that claim ineligible subject matter from those that claim patent-eligible applications of those concepts.  <u>Alice</u>, 573 U.S. at 217.

In step one, the court must determine whether the claims are drawn to a patent-ineligible concept, such as an abstract idea.  <u>Id.</u>  To do so, the court examines the focus of the claim and its character as a whole.  <u>SAP Am., Inc. v. InvestPic, LLC</u>, 898 F.3d 1161, 1167 (Fed. Cir. 2018).  Courts must consider whether the focus of the claims is on "the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."  <u>Finjan, Inc. v. Blue Coat Sys., Inc.</u>, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting <u>Enfish, LLC v. Microsoft Corp.</u> ("<u>Enfish</u>"), 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)).

If the claims are drawn to an abstract idea at step one of the analysis, the court then turns to step two to examine "the elements of each claim both individually and as an ordered combination" to see if there is an "inventive concept—<i>i.e.</i>, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the

ineligible concept itself." <u>Alice</u>, 573 U.S. at 217–18 (internal quotations omitted).

"A claim that recites an abstract idea must include additional features to ensure that

the claim is more than a drafting effort designed to monopolize the abstract idea."

<u>Id.</u> at 221 (internal quotations omitted).  Such "additional features" are not enough

to constitute an inventive concept if they are "well-understood, routine,

conventional activities." <u>Id.</u> at 225.  To transform an unpatentable concept into a

patent-eligible application, "one must do more than simply state the [ineligible

concept] while adding the words 'apply it.'" <u>Mayo</u>, 566 U.S. at 72.

## 1.    Representative Claim

A claim is representative if it does not differ significantly from other claims

recited in the patent, and courts may treat a claim as representative if the patentee

does not present any meaningful argument for the distinctive significance of any

claim limitations not found in the representative claim.  <u>See</u> <u>Berkheimer v. HP Inc.</u>,

881 F.3d 1360, 1365 (Fed. Cir. 2018).

The Parties agree that claim 1 of the '812 Patent is representative of the

Asserted Patents.  Data Health states that claim 1 of the '812 Patent is

representative of the '812 Patent because the '554 Patent and '142 Patent are

continuations of the '812 Patent, and that claim 1 of the '554 Patent and claim 1 of

the '142 Patent are representative of their respective patents.  <u>See</u> Pl.'s Opp'n Br.

at 7 n.4, 9 n.7.  Teladoc Health acknowledges that the other independent claims in

the '812 Patent, such as claims 11 and 16, recite a "system" and a "server" that

perform the same six steps as claim 1 of the '812 Patent, and that the claims of the

'554 Patent and '142 Patent are substantially similar to the '812 Patent because

they are continuations-in-part of the '812 Patent.  Def.'s Moving Br. at 4–8.

Because the other claims in the '554 Patent and '142 Patent do not differ

significantly from claim 1 of the '812 Patent, the Court concludes that claim 1 of

the '812 Patent is the representative claim.

Claim 1 of the '812 Patent states:

A method for tracking outcome specific data, the method comprising:

receiving input establishing accounts for providers serving clients in a
client management program, wherein the clients are individuals
receiving treatment or assistance, wherein the input includes rules for
determining progress of the clients, wherein the accounts are stored in
a database of a server, and wherein the input is received from an
administrator utilizing one of a plurality of communications devices in
communication with the server by one or more networks;

assigning each of the clients to one or more of the providers in response
to selections from the administrator utilizing one of the plurality of
communications devices, wherein the one or more providers are
individuals available to treat or assist the clients;

prompting the providers to provide data associated with each of the
clients that is required and not already received through the client
management program, wherein the one or more providers periodically
provide/update the data, and wherein the data relates to the well-being
of the clients;

compiling the data associated with each of the clients received from the
providers without input from the clients for the client management

program to generate a score utilizing the rules, wherein the score is associated with progress toward mastery of one or more goals;

analyzing the compiled data and the score to automatically determine a status of the clients within the client management program, wherein the score is compared with previous compiled data to determine whether a plurality of measurements of the compiled data vary from a threshold to become significant; and

automatically communicating an alert including the compiled data and the status from the server executing the client management program to the plurality of communications devices associated with the providers assigned to one of the clients that is utilized by the administrator or one or more of the providers to intervene with the client in response to the plurality of measurements of the compiled data varying from the threshold to become significant for one of the clients.

'812 Patent at 31:9–51.

## 2.    <u>Alice</u> Step One

The Court first assesses <u>Alice</u>'s step one, looking to the "character as a whole" or "focus" of the claims to determine whether they are "directed to" an abstract idea.  District courts may compare the claims at issue to claims already found to be directed to an abstract idea in previous cases to inform the step one analysis.  <u>See</u> <u>Enfish</u>, 822 F.3d at 1334.

Teladoc Health argues that the Asserted Patents simply amount to tracking an individual's progress toward treatment-related goals, which is a process that healthcare providers have long performed with pen and paper.  Def.'s Moving Br. at 5.  Data Health disagrees, contending that the claims of the Asserted Patents embody technological improvements to processes for tracking outcome-specific

data and more effectively assisting clients achieve progression towards a goal, and that Teladoc Health's conception of the Asserted Patents is overgeneralized because it ignores claim elements and limitations that define the concrete "goal mastery" improvements.  See Pl.'s Opp'n Br. at 7, 9.

The '812 Patent purports to improve the electronic systems, equipment, software, and processes for tracking, treating, and recording results for individuals with special needs, and for increased efficiency of prior procedures dependent on paper documents and charts to track individuals' information or a single system available from one location to enter and review data.  See '812 Patent.  The abstract describes a system, method, server, and computer readable medium for tracking outcome specific data.  Id.  Clients, who are assigned to one or more providers, have accounts that are stored in a server, and data associated with each of the clients received from the providers are compiled utilizing computing or communications devices in communication with the server.  Id.  The compiled data are then presented visually in response to a user request, and automatic notifications are sent to the provider and client depending on the status of the client.  Id.

Reading claim 1 of the '812 Patent in its entirety, its focus is on collecting a patient's health information and then analyzing this information to monitor whether the patient is meeting set goals, through the employment of notifications

that either indicate progress or provide necessary intervention to keep the patient

on track to meet the goal.  The method of claim 1 recites six basic elements:

(1) receiving input and establishing an account for providers who serve clients;

(2) assigning clients to providers; (3) prompting providers to enter data relating to

each client; (4) compiling the data; (5) analyzing the data to determine whether the

data deviate from a pre-determined threshold; and (6) communicating an alert if

the client data deviate from a pre-determined threshold.  Id. at 31:9–52.

 Teladoc Health contends that the claims focus on the manual process for

patient intake and treatment, which has been a "longstanding, pen-and-paper

process," make the process faster or more efficient via computerization, and are

ultimately directed to the abstract idea of collecting, analyzing, and displaying

data.  See Def.'s Moving Br. at 3–16; Def.'s Reply Br. at 6–8.

 The U.S. Court of Appeals for the Federal Circuit ("CAFC") has

"treated collecting information, including when limited to particular content

(which does not change its character as information), as within the realm of

abstract ideas," along with the analysis and display of information.  Elec.

Power Grp., LLC v. Alstom S.A. ("Electric Power Group"), 830 F.3d 1350,

1353 (Fed. Cir. 2016); see also In re TLI Commc'ns LLC Patent Litig., 823

F.3d 607, 611 (Fed. Cir. 2016); FairWarning IP, LLC v. Iatric Sys., Inc., 839

F.3d 1089, 1095 (Fed. Cir. 2016); CardioNet, LLC v. InfoBionic, Inc., 816

F. App'x 471, 475 (Fed. Cir. 2020); <u>Content Extraction & Transmission</u>

<u>LLC v. Wells Fargo Bank, Nat'l Ass'n</u>, 776 F.3d 1343, 1347 (Fed. Cir.

2014). The CAFC has explained that claims reciting those concepts, either

individually or collectively, "fall into a familiar class of claims" directed to

patent-ineligible concepts:

> Information as such is an intangible. Accordingly, we have treated *collecting* information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas. In a similar vein, we have treated *analyzing* information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category. And we have recognized that merely *presenting* the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis.

<u>Elec. Power Grp.</u>, 830 F.3d at 1353–54 (internal citations omitted) (emphasis

added).

Claims that are merely directed to an abstract idea and applied with generic,

conventional computer components have been held consistently to be patent-

ineligible. See <u>Intell. Ventures I LLC v. Capital One Bank (USA)</u>, 792 F.3d 1363,

1367–69 (Fed. Cir. 2015) (claims adding generic computer components to

financial budgeting); <u>OIP Techs. Inc. v. Amazon.com, Inc</u>, 788 F.3d 1359, 1362–

64 (Fed. Cir. 2015) (claims implementing offer-based price optimization using

conventional computer activities); <u>Ultramercial, Inc. v. Hulu, LLC</u>, 772 F.3d 709,

714–17 (Fed. Cir. 2014) (claims applying an exchange of advertising for copyrighted content to the internet); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1354–55 (Fed. Cir. 2014) (claims adding generic computer functionality to the formation of guaranteed contractual relationships).

The Court observes that the '812 Patent recites generic components, such as "servers," "network equipment," "wireless devices," and "communication devices." See '812 Patent at 7:42–8:11. Devices can communicate across different types of networks, such as wired or wireless networks, data or packet networks, private networks, and publicly switched telephone networks, also utilizing satellite connections, Wi-Fi, cellular networks, or hardwired connections. See id. at 8:13–27. Data Health concedes that the '812 Patent recites generic computer components, but argues that claim 1 of the '812 Patent contains subject-eligible matter, even if it automates a manual process, because the claim is directed to a "specific asserted improvement in computer capabilities" rather than "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." See Enfish, 822 F.3d at 1336–37 (citation omitted); see also Pl.'s Opp'n Br. at 16 ("Here, while generic computer components are used, the integration of the iterative processes and rules for tracking goal progression—not the mere use of computers—improves the existing 'pen-and-paper' approach to create vastly

enhanced goal attainment results"); Def.'s Moving Br. at 9–11; Def.'s Reply Br. at 6–7.

The Court finds that claim 1 is analogous to the claims in <u>TaKaDu Ltd. v. Innovyze, Inc.</u>, No. 21-cv-00291-RGA, 2022 WL 684409 (D. Del. Mar. 8, 2022). In <u>TaKaDu</u>, patent claims used for monitoring a water utility network were held to be not abstract because they were directed to "improved monitoring methods of water utility networks and resource distribution of said networks." <u>TaKaDu</u>, 2022 WL 684409, at *4–6. The claims recited a way to identify water leakage events by comparing data received from a water meter with statistically predicted values, in which a leakage event was logged when the received data deviated from the predicted values. <u>Id.</u> at *4.

The court emphasized that there is an "important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them," and then explained that TaKaDu's patents were directed to a technological improvement because its claims "[taught] particular ways of achieving data analysis." <u>Id.</u> at *5. These claims were distinguishable from those in <u>Electric Power Group</u>, which also involved the gathering and analyzing data for a water utility network, but they were held to be directed to an abstract idea because they "[did] not go beyond requiring the collection, analysis, and display of available information in a

particular field, stating those functions in general terms, without limiting them to

technical means for performing the functions that are arguably an advance over

conventional computer and network technology." Id. (citing Elec. Power Grp., 830

F.3d at 1351).  Rather than merely instructing the user to analyze the data, the

TaKuDu patents taught "improved computer systems that use specific modes of

data analysis," unlike the claims in Electric Power Group.  Id.  The court also

agreed with TaKuDu's argument that the methods and systems recited by the

patents were "highly complicated and [were] not traditional tasks that an individual

can perform with just pen and paper to meet the goals of the claimed invention"

because the TaKuDu patents involved the use of statistical analysis and the

manipulation of geographical information system data.  Id. at *6.

        Similar to the TaKuDu patents, the claims in the '812 Patent are not simply

directed to the abstract idea of the collection, analysis, and display of data.  Rather,

the '812 Patent includes a method of statistical analysis to improve the monitoring

of goal outcomes for patients.  The '812 Patent includes the use of a scoring

system to identify "client-specific factors that hinder or promote the particular

client's attainment of a goal" and then sends automatic notifications to "intervene

at crucial times to enhance the client's adherence to his or her unique regimen."

See Pl.'s Opp'n Br. at 10.  The analysis step in claim 1 recites:

        analyzing the compiled data and the score to automatically determine a
        status of the clients within the client management program, wherein the

> score is compared with previous compiled data to determine whether a
> plurality of measurements of the compiled data vary from a threshold
> to become significant.

'812 Patent at 31:37–42.

The compiled data are analyzed to determine if there is a sufficient score variance to constitute a difference that should elicit an automatic notification. For example, it may be determined that a patient is not on track if two of the three most recent data points are worse than the minimum growth line, which is a graphical line that runs from the baseline date and score to the mastery level on the date that starts the final mastery window (the last window of opportunity to reach and maintain the mastery level before the goal ends). See id. at 6:17–19, 46–48. If three consecutive data points are worse than the minimum growth line, the third data point may have a status identified as "significant," and then triggers the provider-defined Analysis of Influences Matrix ("AIM") review process to evaluate possible factors that are inhibiting progress and would identify changes to the facts that can encourage progress. See id. at 6:46–60. While the calculation of the scores does not rise to the level of complexity of statistical analysis as the TaKuDu patents, the '812 Patent does not only instruct the user to analyze the data, but also describes how to determine when compiled data signify a score variance that is significantly different from a predetermined threshold and would require a notification for intervention.

Even though the '812 Patent involves the remote monitoring of patients, it is also not directed to the abstract idea of tracking compliance with treatment guidelines because of its broad application (being not merely restricted to treatment guidelines) and its utilization of a scoring system to determine whether a patient is adhering to a set goal or regime.  See My Health, Inc. v. ALR Techs., Inc., No. 16-cv-00535-RWS, 2017 WL 1129904, at *2 (E.D. Tex. Mar. 27, 2017) (holding that a patent involving the remote monitoring of patients with chronic illnesses was directed to the abstract idea of tracking compliance with treatment guidelines and did not improve the functioning of a computer).  The prosecution history also indicates that the claims in the '812 Patent were revised to meet the standard of Alice.  See Notice of Allowability at 3.  Deference to a patent examiner's decision to allow claims is incorporated into the presumption of patent validity under 35 U.S.C. § 282, which includes the presumption that the examiner acted properly in determining whether an application was entitled to a patent.  Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Inc., 719 F.3d 1346, 1357 (Fed. Cir. 2013); see also Cleveland Clinic Found. v. True Health Diagnostics LLC, 760 F. App'x 1013, 1021 (Fed. Cir. 2019).

Accordingly, the Court holds that the Asserted Patents plausibly recite patent-eligible subject matter under § 101.  Claim 1 of the '812 Patent is directed to the non-abstract idea of improving the monitoring of patient goals and

outcomes.  Because the claim is directed to a non-abstract idea, the Court need not

discuss <u>Alice</u>'s step two.

### C.    Willful Infringement

Plaintiff seeks enhanced damages under 35 U.S.C. § 284 for willful

infringement of the Asserted Patents.  <u>See</u> Am. Compl. ¶¶ 36, 42, 48.  Data Health

alleges both pre-suit and post-suit willful infringement claims for the Asserted

Patents.  The Amended Complaint alleges that Teladoc Health had knowledge of

its infringement of the Asserted Patents "at least since the filing of this complaint

on February 13, 2023."  <u>Id.</u> ¶¶ 34, 40, 46.   The Court notes that Data Health's

original complaint was filed on February 13, 2023 alleging infringement of the

'812 Patent and the '554 Patent, and Data Health filed the Amended Complaint on

June 27, 2023 to include infringement of the '142 Patent.  Compl.; Am. Compl.

The pleadings allege post-filing[2] willful infringement claims for the Asserted

Patents, though Teladoc Health's briefs only contest whether there is pre-suit

knowledge sufficient for willful infringement.  <u>See</u> Def.'s Moving Br.; Pl.'s Opp'n

Br.; Def.'s Reply Br.  Because Teladoc Health's briefs only challenge pre-suit

knowledge as a basis for willful infringement, the Court does not address the issue

---

[2]  The Court uses "post-suit" and "post-filing" conduct interchangeably, referring
to conduct occurring after the date on which the patentee filed the relevant claim of
willful infringement.

of whether post-suit knowledge is sufficient to support a willful infringement claim.

The Amended Complaint also alleges that "Teladoc [Health] was aware that it was infringing [the Asserted Patents] before the filing of this complaint on February 13, 2023" because of its "claim to status as a 'market leader in virtual care and applied health signals,' its knowledge that Livongo's business may have been based on the technology patented by others, and the publication of Grafton's innovative behavioral health patents."  Am. Compl. ¶¶ 36, 42, 48.  The pleading language "before the filing of the complaint on February 13, 2023" suggests that these are allegations for pre-suit willful infringement claims.  For purposes of this motion to dismiss, the Court interprets the Amended Complaint to allege both pre-suit and post-suit willful infringement claims for the Asserted Patents.

Under 35 U.S.C. § 284, the Court may increase the amount of damages assessed by up to three times.  35 U.S.C. § 284.  The U.S. Supreme Court has observed that enhanced damages:

> are not to be meted out in a typical infringement case, but are instead designed as a "punitive" or "vindictive" sanction for egregious infringement behavior.  The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton,

malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—
indeed—characteristic of a pirate.

Halo Elecs., Inc. v. Pulse Elecs. Inc. ("Halo"), 579 U.S. 93, 104–05 (2016).

For willful infringement claims, "the patentee must allege facts in its
pleading plausibly demonstrating that the accused infringer had committed
subjective willful infringement as of the date of the filing of the willful
infringement claim." Välinge Innovation AB v. Halstead New England Corp., No.
16-cv-1082-LPS-CJB, 2018 WL 2411218, at *10–12 (D. Del. May 29, 2018),
report and recommendation adopted, 2018 WL 11013901 (D. Del. Nov. 6, 2018).
"The subjective willfulness of a patent infringer, intentional or knowing, may
warrant enhanced damages, without regard to whether his infringement was
objectively reckless." Halo, 579 U.S. at 105; see also WBIP, LLC v. Kohler Co.,
829 F.3d 1317, 1341 (Fed. Cir. 2016) ("Knowledge of the patent alleged to be
willfully infringed continues to be a prerequisite to enhanced damages.").
Subjective willfulness may be found when "the risk of infringement 'was either
known or so obvious that it should have been known to the accused infringer.'"
Halo, 579 U.S. at 101 (quoting In re Seagate Techs., LLC, 497 F.3d 1360, 1371
(Fed. Cir. 2007)).

### 1.    Pre-Suit Claims

At the pleading stage, the patentee "must allege facts in its pleading
plausibly demonstrating that the accused infringer had committed subjective

willful infringement as of the date of the filing of the willful infringement claim." Välinge Innovation AB, 2018 WL 2411218, at *10–12.  This standard can be distilled into three elements, that the accused infringer: (1) was aware of the patent, (2) infringed the patent after becoming aware of its existence, and (3) knew or should have known that its conduct amounted to infringement.  See id. at *13.

Data Health clarifies that its allegation of Teladoc Health's pre-suit implied notice and knowledge of the Asserted Patents is based on Teladoc Health's public statement that it is a "market leader in virtual care and applied health signals," from which Data Health draws the inference that Teladoc Health has "broad knowledge of developments in the behavioral health space."  See Pl.'s Opp'n Br. at 18–19.

Teladoc Health contends that it lacked pre-suit knowledge of the Asserted Patents and did not act willfully during the pre-suit period, and that the Amended Complaint contains no factual allegations that would show egregious conduct to support a finding of willful infringement.  Def.'s Moving Br. at 18–19.

Data Health seeks to infer Teladoc Health's pre-suit knowledge of the Asserted Patents from Teladoc Health's general statement that it is a market leader in the industry, but this vague allegation that an industry market leader has knowledge of specific competitor patents is too general and speculative to support a claim of willfulness.  See VLSI Tech. LLC v. Intel Corp., No. 18-cv-00966-CFC,

2020 WL 3488584, at *5 (D. Del. June 26, 2020) (finding no pre-suit knowledge of infringement when pleading alleged only that defendant "monitored its competitors' activities generally"). Even drawing all reasonable inferences in favor of Data Health, the general allegation that status as a market leader should impute knowledge of a competitor's patent is insufficient to support a plausible claim that Teladoc Health had pre-suit knowledge that its activities infringed the Asserted Patents. The Court holds that the Amended Complaint fails to allege sufficient facts to support an inference of pre-suit willful infringement of the Asserted Patents.

### 2.     Post-Suit Claims

As mentioned above, Teladoc Health's briefs do not argue whether post-suit knowledge is sufficient to sustain the willful infringement claims. Therefore, the Court does not address the issue of post-suit willful infringement.

### D.     Conclusion

ACCORDINGLY, IT IS HEREBY

**ORDERED** that Defendant's Motion to Dismiss Plaintiff's Amended Complaint (D.I. 18) is denied in part and granted in part. The Court denies Teladoc Health's motion to dismiss Data Health's direct infringement claims for the Asserted Patents. The Court grants Teladoc Health's motion to dismiss Data Health's pre-suit willful infringement claims for the Asserted Patents.

IT IS SO ORDERED this 20th day of May, 2024.

/s/ Jennifer-Choe Groves
Jennifer Choe-Groves
U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.